**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**

| | |
|---|---|
| **WAYNE A. WHITFORD,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| v. ) | **Case number 4:04cv1437 TCM** |
| ) | |
| **JO ANNE B. BARNHART,** ) | |
| **Commissioner of Social Security,** ) | |
| ) | |
| **Defendant.** ) | |

## MEMORANDUM AND ORDER

This is an action under 42 U.S.C. § 405(g) for judicial review of the final decision of

Jo Anne B. Barnhart, the Commissioner of Social Security ("Commissioner"), holding that

Wayne Whitford was no longer eligible for supplemental security income benefits under

Title XVI of the Social Security Act ("the Act"), 42 U.S.C. §§ 1381-1383b. Mr. Whitford

("Plaintiff") has filed a brief in support of his complaint; the Commissioner has filed a brief

in support of her answer.[1]

## Procedural History

In November 1992, an application for SSI benefits was filed by Plaintiff's mother on

his behalf. (R.[2] at 78-81.) Plaintiff's impairment was "slow learner" and the date it allegedly

began was the date of his birth, June 18, 1983. (Id. at 78.) Plaintiff was awarded benefits

---

[1]The case is before the undersigned for a final disposition pursuant to the written consent of
the parties. See 28 U.S.C. § 636(c).

[2]References to "R." are to the administrative record filed by the Commissioner with her
answer.

on the basis of mental retardation with an effective date of August 1, 1992.  (Id. at 82.)  In April 2002, after he attained the age of 18 years, Plaintiff was notified that his SSI benefits would be terminated.  (Id. at 289-93.)  Plaintiff requested reconsideration; however, the cessation was affirmed.  (Id. at 294-97.)  The cessation was again affirmed after a disability hearing.  (Id. at 298-319.)  Plaintiff then requested a hearing before an administrative law judge ("ALJ").  (Id. at 320-23.)  After a hearing held in June 2004, the ALJ, Francis J. Eyerman, determined that as of April 30, 2002, Plaintiff was no longer disabled within the meaning of the Act.  (Id. at 13-19, 46-76.)  The Appeals Council denied Plaintiff's request for review of the ALJ's adverse decision, effectively adopting that  decision as the final decision of the Commissioner.  (Id. at 5-7.)

## Testimony Before the ALJ

Plaintiff, represented by counsel, his aunt, Camille Townsend, and a vocational expert ("VE"), J. Stephen Dolan, testified at the administrative hearing.

Plaintiff testified he lived with his aunt and his brother.  (Id. at 50.)  His aunt helps him with things like telling him to put his clothes away or to fold them.  (Id. at 51.)  He can use the refrigerator, stove, and microwave, but is not to use the washing machine or dryer. (Id.)  He does not use the stove when his aunt is not there because he does not want to be blamed if something goes wrong.  (Id. at 52.)  He is able to go to the grocery store to replenish foods he notices are needed and is able to check the change he is given against the receipt.  (Id. at 52-53.)  He helps around the house.  (Id. at 53.)  For instance, he folds

clothes, mops, vacuums, dusts, cleans, and does dishes.  (Id.)  He also works in the yard.  (Id.)  Specifically, he cuts and trims the grass, picks weeds, and limes the grass.  (Id.)

If Plaintiff receives a letter, he reads it.  (Id.)  If he doesn't know a word, he asks his aunt.  (Id.)

Plaintiff further testified that he works five hours a day, four days a week at the airport for the Great American Bagel.  (Id. at 54-55.)  He makes sandwiches, does dishes, sweeps and mops, wipes the counters and tables, takes out the trash, and cooks food.  (Id. at 54.)  He has worked there for two or three years.  (Id.)  Initially, he worked at the airport through a special education work study program; now he works there on his own.  (Id. at 65.)

Plaintiff does not have any physical problems, takes no medications, and does not smoke.  (Id. at 55-56.)

Ms. Townsend testified that when she was in school she was in special education classes like her nephew.  (Id. at 57.)  She was 18 years old when she left school; she did not have a high school diploma.  (Id.)  Plaintiff recently received a certificate from a special training program.  (Id. at 58.)  He was placed in that program because he could not read well and needed help learning how to do things like ride the bus, how to get a job, and how to live independently.  (Id.)  When in the program, Plaintiff did janitorial work at the high school.  (Id. at 59.)  His job at the bagel place had only been for five or six months, although he had been working at the airport for longer.  (Id.)  She has not heard any complaints about his work.  (Id. at 60.)

Plaintiff rides the bus to and from work. (Id.) He has been able to do that for a few years. (Id.) He does not cook his own meals, although he does use the microwave. (Id. at 61.) She did not think he would be able to choose a balanced diet if he lived by himself. (Id.) He cannot read very well. (Id.) She manages his money and gives him an allowance. (Id.) He does not have any problem getting along with others. (Id. at 62.)

Plaintiff has lived with Ms. Townsend since his mother died six years before. (Id. at 57.) When asked if she thought he was capable of living by himself, Ms. Townsend replied that eventually he probably would be. (Id. at 62.) If he was offered a full-time job like the one he currently had, she thought he would be able to work full-time independently. (Id.) He would, however, not be able to get a job by looking at newspaper ads. (Id.)

Ms. Townsend further testified that she retired in 1992 from her job as a cook for the State Hospital, but got a part-time job as a cook for a day-care center because she needed the money. (Id. at 63.)

Mr. Dolan was asked the following question by the ALJ:

I want you to assume that I could find from the medical and other evidence of the record as a whole that the claimant is 20 years of age, a younger individual, that he has a 12th grade special education . . . , has the work experience with no transferability of skills and, and that he has been diagnosed with and suffers from a mild mental retardation. He has a verbal IQ of 68, performance IQ of 67, full scale IQ of 65. The State Agency . . . feel[s] that the claimant has . . . moderate restrictions in daily living, mild limitations in social functioning and moderate difficulties in concentration, persistence of pace, maintaining those things. And there is no evidence of any decompensation or things like that. His ability to understand and remember instructions are slightly impaired. . . . Hygiene and grooming are appropriate. His insight and judgment is somewhat limited. And he, he needs moderate clarification in following verbal, written directions. It was reported at the end

of the work study assignment that he was a hard worker and completes task in a satisfactory manner and continues to require additional assistance with socialization skills. His job coach notes his work is of average quality and he gets along well with all supervisors. He takes instructions well and does his best to follow through on tasks. . . . [W]ould you know if any jobs that exist in significant numbers, either in the areas where the claimant lives or the several other regions of the national economy he would be able to perform? . . . Do you feel there would be anything in the competitive labor market he would be able to perform[?]

(Id. at 69-70.) (Alterations added.) Mr. Dolan replied that there jobs Plaintiff should be able to do with the restrictions outlined by the ALJ. (Id. at 70.) These jobs would include the position of cook helper that Plaintiff was currently doing. (Id.) There were 6,000 of these positions full-time in the St. Louis metropolitan area. (Id.) There were also 2,300 dishwasher positions and 4,000 bus boy positions. (Id.)

If, however, Mr. Dolan was to assume a claimant with Plaintiff's age, education, experience, diagnosis, and IQ scores, with mild impairments in social functioning, and with moderate impairments in (i) his activities of daily living, concentration, persistence and pace, (ii) his ability to sustain the attention required to perform simple, repetitive tasks, (iii) his ability to withstand the stress and pressure of day to day work activities, and (iv) his ability to deal with routine changes in the work environment, such claimant would not be able to maintain full-time, competitive employment. (Id. at 70-71.)

In response to further questions by the ALJ, Mr. Dolan testified that the November 2003 career training program evaluation of Plaintiff did not change his testimony about the dishwasher, cook's helper, and bus boy jobs that a claimant with Plaintiff's abilities could perform. (Id. at 72-73.) In response to Plaintiff's counsel's observation that the career

training program evaluations were completed after Plaintiff had completed only 67 hours of work, Mr. Dolan replied it would be an unsafe assumption to assume that someone with mental retardation would or would not engage in the same work behavior if he was working more hours. (<u>Id.</u> at 73.)

**<u>Medical and Other Records Before the ALJ</u>**

The documentary record before the ALJ included forms completed on behalf of Plaintiff as part of the redetermination process; documents generated pursuant to that process; school records; and various evaluation reports.

When he was in second grade, Plaintiff was given a psychological and educational assessment because of his low academic achievement. (<u>Id.</u> at 116-33.) Three problem areas had been earlier identified. (<u>Id.</u> at 117.) One, he did not know his addition facts. (<u>Id.</u>) Two, he did not recognize the letters "A" through "H". (<u>Id.</u>) Three, he was easily distracted. (<u>Id.</u>) After an unspecified period of tutoring, Plaintiff still did not know his addition facts, had made a 50% improvement in recognizing letters, and could stay on task for five minutes. (<u>Id.</u>) His results on the Wechsler Intelligence Scale for Children, Revised ("WISC-R"), i.e., a verbal score of 60, a performance score of 46, and a full scale score of 50, placed him in the mild mental retardation range of intellectual functioning. (<u>Id.</u> at 118.) These scores placed his mental age at four years below his chronological age. (<u>Id.</u>) His mother had completed a Vineland Adaptive Behavior Scale-Interview Edition, Survey Form ("VABS"). (<u>Id.</u>) The VABS assessed an individual's ability to function in the area of adaptive behavior, communication, daily living skills, and socialization. (<u>Id.</u>) Plaintiff's scores were in the low

range and were consistent with his WISC-R scores. (Id.) Additionally, his scores on the Bender-Gestalt Test for Young Children placed his developmental age at three years below his chronological age of eight years and eight months and were also consistent with his WISC-R scores. (Id.) The evaluation team concluded that Plaintiff was educable mentally retarded. (Id. at 133.) He was placed in a self-contained, special education class. (Id. at 121.)

Consequently, an individual education program ("IEP") was developed for Plaintiff for the next school year. (Id. at 139-44.)

Plaintiff was reevaluated when he was eleven years old, in 1995. (Id. at 183-93.) It was then noted that, inter alia, his concentration skills were "fair," although "with much fidgeting exhibited." (Id. at 184.) "He was able to attend to directions but had difficulty following them, with some directions needing several repetitions." (Id.) Plaintiff's teacher had reported that he was "often off task when working in the classroom and need[ed] constant redirection." (Id.) He was not able to work independently. (Id.) It was further noted that Plaintiff had "problematic work habits," e.g., "distractability, short attention span, reluctance to begin tasks, giving up easily, careless performance of school work, organization of time and materials, need for repetition and reteaching, need for additional time to complete assignments, working independently, and working with others in a group." (Id. at 185.) Plaintiff's scores on the WISC-R were a verbal IQ of 51, performance IQ of 67, and a full scale IQ of 55.[3] (Id. at 191, 250.) These scores classified him as mildly mentally

_____

[3]His verbal IQ score was lower than in 1992, the other two IQ scores were higher.

retarded.  (Id. at 193.)  His language abilities were commensurate with his level of cognitive functioning.  (Id. at 188.)  His age equivalent on the VABS was six years in the areas of communication and socialization and seven years in the area of daily living skills.  (Id. at 191.)

In 1998, Plaintiff was in ninth grade and had not mastered basic reading and arithmetic skills.  (Id. at 196.)  He was functioning at least seven to eight years below his chronological age.  (Id.)  In the area of vocational readiness, it was reported that Plaintiff "put[] forth much effort."  (Id. at 197.)  He could stay on task with reminders and was becoming more self-directed.  (Id.)  He needed moderate clarification in following directions. (Id.)  He often did not accept responsibility for his own actions.  (Id.)  One of his IEP goals was to increase skills necessary for independence as an adult, e.g., to learn how to take the bus to and from work and school, to understand the vocabulary in the Department of Motor Vehicles handbook, to develop reading skills necessary for employment, and to identify the abbreviations used in want ads.  (Id. at 201, 204.)  A reading assessment indicated that Plaintiff needed help in constructing simple sentences and in spelling.  (Id. at 252.)  His knowledge of basic math facts was assessed as being a moderate problem.  (Id. at 253.)  He had a severe problem when applying math to daily situations.  (Id.)  Additionally, his socialization skills were interfering with his classroom performance.  (Id.)  He had a short attention span, but when he fully understood what was required of him and when the task was within his ability range, he was able to devote his full attention to the task and tried to do his best.  (Id. at 254.)  The diagnosis remained mildly mentally retarded.  (Id. at 256.)

When Plaintiff was in the tenth grade, the Social Security Administration ("SSA") notified Ms. Townsend that his case was being reviewed pursuant to their standard procedures. (Id. at 148-49.) Ms. Townsend reported that Plaintiff cleaned his room, took out the garbage, vacuumed, and cleaned and swept the kitchen closet. (Id. at 155.) He also played basketball, swam, skated, and participated in church and YMCA activities. (Id.) The SSA interviewer noted that Plaintiff answered some of the questions about his school work himself. (Id. at 159.) On another form, Ms. Townsend reported that Plaintiff would behave well with adults when someone was looking and needed constant reminders when completing chores. (Id. at 180.)

The next year, in May 2000, Plaintiff 's IEP was again reviewed. (Id. at 267-79.) It was noted that Plaintiff was easily distracted, did not accept the consequences of his actions, did not admit when he had done something wrong, had not mastered basic addition and subtraction skills, and worked best in one-on-one instruction or in a small group. (Id. at 268.) He was sometimes disruptive. (Id.) He had been removed from a paid work study position in the school cafeteria for socializing instead of working and for leaving without completing his job assignment. (Id.) His current supervisor, in the custodial department, reported that Plaintiff was a hard worker and satisfactorily completed tasks. (Id.) His IEP was to include social skills training to increase his appropriate socialization skills. (Id.) It was also noted that he was participating in a career exploration class to learn about job skills. (Id. at 269.) He was making progress in the areas of using math in real-life situations, e.g., bank accounts, wages, and writing a paragraph with correct grammar, punctuation, and

spelling.  (Id. at 270.)  He was also making progress in not being distracted during class, not distracting others, and interacting appropriately for 30 minutes without incident.  (Id. at 271.)

The following year, it was again noted that Plaintiff was easily distracted, did not accept the consequences of his actions, and did not admit when he had done something wrong.  (Id. at 354.)  It was further noted, however, that his social and arithmetic skills were emerging.  (Id.)  He was described as tending to rely on others for assistance and being reluctant to work alone.  (Id.)  He was being integrated into two general education classes, art and concert choir.  (Id.)  His grade in the former was a "B".  (Id.)  Additionally, as to the goal that he begin and complete an assignment with his best effort with no more than two verbal clues, Plaintiff had made progress on that goal and needed only three clues.  (Id. at 359.)  As to the goal of not being distracted or distracting others during class activities for 70% of the observed period, Plaintiff was able to do so for 60% of the period.  (Id. at 360.)

The IEP 2003 meeting for Plaintiff was held at the career training program at the airport.  (Id. at 417.)  Ms. Townsend did not attend.  (Id. at 416.)  The IEP team, chaired by Kay Pautler, concluded that Plaintiff would benefit from supervised paid employment prior to graduation.  (Id. at 419.)  It was noted that Plaintiff had been employed part-time at the Pasta House for one year.  (Id. at 424.)  He was working on obtaining his driver's license, on budgeting money, and on developing his independent living skills.  (Id.)  A September 2003 evaluation of Plaintiff by his supervisor at the airport for the month beginning August 18 assessed Plaintiff as having difficulty in only one of sixteen categories, reporting if he was unable to work, in the 81 hours he had worked during the relevant period.  (Id. at 454.)  He

frequently performed satisfactorily in five of the remaining fifteen categories, including in following directions, accepting responsibility, complying with rules, and working independently with minimal supervision. (<u>Id.</u>) In the other ten categories, Plaintiff always performed satisfactorily, including working at a reasonable speed and completing tasks accurately. (<u>Id.</u>) Plaintiff was completing 30% of a regular employee's duties. (<u>Id.</u>) Another evaluation form was completed the following month by Plaintiff's supervisor at the bagel restaurant. (<u>Id.</u> at 448.) Plaintiff had worked 39 hours during this period, and was completing 75% of a regular employee's duties. (<u>Id.</u>) He always or frequently performed satisfactorily in the work-related categories. (<u>Id.</u>) His supervisor, Milan Patel, noted that Plaintiff knew when he came in what needed to be done and did it. (<u>Id.</u>) Mr. Patel assessed Plaintiff the following month, and increased the number of categories in which he always performed satisfactorily from five the previous month to nine. (<u>Id.</u>)

In March 2004, Ms. Pautler, Plaintiff's special education teacher, completed a Mental Medical Source Statement. (<u>Id.</u> at 409-12.) She opined that he was moderately limited in his ability to function independently and to accept instructions and respond to criticism. (<u>Id.</u> at 409-10.) He was mildly to moderately limited in his ability to behave in an emotionally stable manner, to relate in social situations, and to respond to changes in a work setting. (<u>Id.</u>) He was mildly limited in the remaining twelve mental activities. (<u>Id.</u>) He did not have, according to Ms. Pautler, a substantial loss in his ability to understand, remember, and carry out simple instructions; to make judgments that were commensurate with the functions of unskilled work; to respond appropriately to supervision, co-workers, and usual work

situations; and to deal with changes in a routine work setting.  (Id. at 411.)   She also noted that Plaintiff's work evaluations had been average to excellent for most jobs.  (Id. at 412.) Plaintiff learned his jobs well and could work independently when he knew what was expected.  (Id.)

As part of the SSA review process, a non-examining psychiatrist, Margaret Crumpacker, M.D., completed a Childhood Disability Evaluation Report in March 1999.  (Id. at 213-16.)  She concluded that Plaintiff satisfied the criteria for Listing 112.05(C).  (Id. at 213.)  Consequently, his benefits were continued on that basis.  (Id. at 217.)  The letter informing Ms. Townsend of the continuation also informed her that Plaintiff's case would be reviewed in three years.  (Id. at 218.)

Two years later, in June 2001, the SSA wrote Ms. Townsend to inform her that Plaintiff's case was being reviewed because he was 18 years old and a decision had to be made whether he was disabled under the rules applicable to adults.  (Id. at 220-23.)  As instructed in that letter, Ms. Townsend completed several forms as part of the review process.  One form was a Disability Report: Adult.  (Id. at 224-33.)  She reported that Plaintiff was working but had a problem remembering.  (Id. at 225.)  Ms. Townsend also completed a Claimant Questionnaire on behalf of Plaintiff.  (Id. at 242-45.)  She reported[4] that he had a problem following instructions, did not shop, could not count change, and needed help with cleaning and ironing.  (Id. at 243.)

---

[4]Although the first person pronoun was used in answering the questions, the questionnaire was completed by Ms. Townsend.

Plaintiff was evaluated on September 17 by James D. Reid, Ph.D. (Id. at 280-83.) Dr. Reid reported that Plaintiff had been suspended the previous year for throwing papers and exposing himself. (Id. at 280.) On examination, Plaintiff was alert and oriented to person, time, and place. (Id. at 281.) His attention and mental control were adequate. (Id.) He could correctly recite the alphabet in eight seconds and count from one to twenty in three seconds. (Id.) He could not count backwards from twenty. (Id.) Memory, immediate and remote, was intact. (Id.) His knowledge of current events was "impoverished." (Id.) His cognitive development level was at the concrete stage; his insight and social judgment were "somewhat limited." (Id.) His scores on the Wechsler Adult Intelligence Scale, Third Edition ("WAIS-III"), were a verbal IQ of 68, a performance IQ of 67, and a full scale IQ of 65. (Id.) These scores placed him in the range of mild mental retardation. (Id.) Dr. Reid assessed the impact of this retardation on Plaintiff's ability to function as follows. (Id. at 282.) Plaintiff's ability to maintain the attention required to perform simple, repetitive tasks and to withstand the stress and pressure associated with day-to-day work activity was moderately impaired. (Id.) His ability to understand, remember, and follow instructions was slightly impaired. (Id.) His ability to socially interact and to relate to others, including supervisors and fellow workers was "intact." (Id.) His ability to adapt and to cope was "uncertain." (Id.) He did not have the ability to manage his funds. (Id.)

Noting that this assessment by Dr. Reid was inconsistent with the interpretation of the Plaintiff's records by the Missouri Department of Disability Services ("DDS") and that the

reports of Ms. Townsend[5] about Plaintiff's daily behavior were inconsistent with the reports of his behavior by his current work study supervisor, Paula Kresser, Ph.D., a regional psychological consultant, determined in November 2001 that a work assessment was required.  (Id. at 284-85.)  Dr. Kresser also noted that Plaintiff's claim had been continued as meeting the criteria of Listing12.05(D).  (Id. at 284.)

In March 2002, an employer questionnaire was completed by a teacher in the special school district.  (Id. at 347-48.)  Plaintiff had been working in the housekeeping department at the airport since August 2001.  (Id. at 347.)  His work there was under a career training program in the Special School District.  (Id.)  He worked one-on-one with an employee, assisting that employee in such tasks as dusting, mopping, and cleaning toilets.  (Id.)  His work rate and quality was average.  (Id.)  He could do some tasks independently.  (Id.)  He was described as getting along well with his supervisors, following instructions well, and doing his best to follow through on tasks.  (Id.)  He needed a lot of repetition in instructions in order to complete the tasks.  (Id. at 348.)

A reconsideration report was completed in April 2002 by Ms. Townsend on Plaintiff's behalf.  (Id. at 335-40.)  She stated that Plaintiff could not remember directions.  (Id. at 338.) He could ride the bus if he had some help.  (Id.)  He socialized with friends and relatives. (Id.)  He worked for the school district as a janitor from June 2000 to August 2001.  (Id. at 339.)

---

[5]Dr. Reid and the Office of Disability both mistakenly refer to Ms. Townsend as Plaintiff's mother.

The same month, R. Rocco Cottone, Ph.D., completed a Mental Residual Functional Capacity Assessment on Plaintiff. (Id. at 371-74.) Dr. Cottone opined that Plaintiff was moderately limited in his ability to (a) understand and remember detailed instructions, (b) carry out detailed instructions, (c) maintain attention and concentration for extended period. (Id. at 371.) He was not significantly limited in his ability to (a) understand and remember detailed instructions, (b) carry out very short and simple instructions, (c) make simple work-related decisions, (d) complete a normal workday and workweek without interruptions from psychologically based symptoms and perform at a consistent pace without an unreasonable number and length of rest periods, (d) interact appropriately with the general public, (e) ask simple questions or request assistance, (f) accept instructions and respond appropriately to criticism from supervisors, (g) get along with coworkers or peers without distracting them or exhibiting behavioral extremes, (h) maintain socially appropriate behavior and adhere to basis standards of neatness and cleanliness, (i) respond appropriately to changes in the work setting, and (j) be aware of normal hazards and take appropriate precautions. (Id. at 371-72.) Dr. Cottone further opined that there was no evidence of any limitation in the remaining six mental activities. (Id.)

On a separate form, Dr. Cottone assessed the degree of functional limitation Plaintiff had as a consequence of his limited intellectual functioning. (Id. at 375-88.) Plaintiff had, according to Dr. Cottone, a moderate limitation in his activities of daily living and his ability to maintain concentration, persistence and pace. (Id. at 385.) He had a mild limitation in his

ability to maintain social functioning.  (Id.)  There was insufficient evidence of any repeated episodes of decompensation.  (Id.)

Four months later, Richard C. Moreno, Ph.D., completed a Mental Residual Functional Capacity Assessment and a Psychiatric Review Technique form, reaching the same conclusions as Dr. Cottone.  (Id. at 389-406.)  Dr. Moreno also noted that Ms. Townsend[6] and Plaintiff stated that Plaintiff could not follow instructions, read, or write.  (Id. at 405.)  He concluded that their statements did not appear to be wholly credible given the facts in the file.  (Id.)

As noted above, it was decided initially and on reconsideration that Plaintiff's SSI benefits should cease.  Subsequently, a hearing was held before a disability hearing officer.  The officer reported that Plaintiff felt he could work full-time, but he did have trouble reading and with some multiplication and subtraction.  (Id. at 299.)  Plaintiff described his day as beginning at 6:00 a.m. when he awoke on his own.  (Id. at 301.)  He fixed his own breakfast and caught the bus at 8:00 a.m. in front of his house.  (Id.)  After school and work, he would watch television or do chores.  (Id.)  In the evenings, he cleaned up after dinner.  (Id.)  He could use the stove or microwave to fix basic meals, e.g., eggs, ham, sausage, macaroni and cheese, or fried chicken.  (Id. at 302.)  He did not have a driver's license and used public transportation.  (Id.)  He was able to shop independently and knew how to make correct change and to verify that the change given him was correct.  (Id.)  He did not have

---

[6]As did Dr. Field and the Office of Disability, Dr. Moreno refers to Ms. Townsend as Plaintiff's mother.

any behavioral problems.  (Id. at 303.)  He wanted to work in a restaurant after he finished

high school.  (Id. at 304.)  He also felt he could work bagging groceries, stocking shelves,

and moving carts.  (Id.)  The officer determined that Plaintiff had a severe impairment in that

he was unable to perform skilled and/or detailed work, but he was not disabled in that he

could perform all levels of exertion that did not require such work.  (Id. at 316-17.)

Specifically, Plaintiff could work as a bagger, cleaner, or stock checker.  (Id. at 318.)

## The ALJ's Decision

The ALJ first found that Plaintiff was able to read, write, and perform simple math.

(Id. at 14.)  He was not illiterate.  (Id.)  The question was whether he was disabled as an

adult as of April 24, 2002, or thereafter.  (Id.)

Noting that Plaintiff was not alleging any disability as a result of any physical

problem, the ALJ summarized the record relevant to the effect of Plaintiff's mental

retardation on his functioning:

> An IEP completed in October 2003 document [sic] that the claimant's ability
> to relate was intact and hygiene and grooming were appropriate; and that
> ability to understand and remember was only slightly impaired, but the ability
> to maintain attention was moderately impaired.  School records in connection
> with the claimant's involvement in a career training program during 2003
> revealed highly successful accomplishment of work-related tasks and goals.
> In March 2004 special education teacher Paulter stated that the claimant was
> able to work independently.  She added that the claimant was working toward
> competitive employment with job coaching support.  She noted only mild to
> moderate limitations in all areas of functioning.  The claimant graduated in
> May 2004.  Shortly thereafter, by the claimant's own testimony, he is currently
> working and earning monies that will eventually be consistent with that which
> is considered gainful activity.

(Id. at 16.)  (Interim citations omitted.)

The ALJ further found that Plaintiff's and Ms. Townsend's testimony were consistent with each other's testimony and inconsistent with the medical record. (Id.) The ALJ then concluded that Plaintiff's mild mental retardation resulted in mild restrictions of activities of daily living and social functioning and in moderate difficulties maintaining concentration, persistence or pace. (Id.) He was able to understand, remember, and carry out simple one to two step job instructions and to maintain concentration and attention in a routine work setting. (Id.) There was no evidence of Plaintiff "having any extreme inability to perform these functions independently, appropriately and effectively, on a sustained basis." (Id. at 16-17.) And, there were no recorded episodes of decompensation. (Id. at 17.)

Accordingly, the ALJ concluded that Plaintiff had the "ability to perform the basic activities of work [sic] any exertional level. He can understand, remember, and carry out simple one to two step job instructions and maintain concentration and attention in a routine work setting. . . . There is no reason the claimant is not able to perform a full range of substantial gainful activity." (Id.)

Plaintiff had no past relevant work or transferable skills, but he did have the residual functional capacity for a wide range of work. (Id. at 17, 18.) Applying the medical-vocational guidelines (the "Grid"), the ALJ determined that the Grid "provide[d] sufficient occupational mobility even for severely impaired individuals who are not of advance age and have sufficient educational competencies for unskilled work." (Id. at 17.) Moreover, the VE had testified that Plaintiff would be able to perform certain work that existed in the St. Louis

statistical area.  Accordingly, the ALJ concluded, Plaintiff was no longer disabled as of April 30, 2002.  (Id.)

**Legal Standards**

Under the Social Security Act, the Commissioner shall find a person disabled if the claimant is "unable to engage in any substantial activity by reason of any medically determinable physical or mental impairment," which must last for a continuous period of at least twelve months or be expected to result in death.  42 U.S.C. § 1382c(a)(3)(A).  The impairment suffered must be "of such severity that [the claimant] is not only unable to do his previous work, but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy."  42 U.S.C. § 1382c(a)(3)(B).

The Commissioner has established a five-step process for determining whether a person is disabled.  See 20 C.F.R. §§ 416.920, 404.1520.  See also **Ramirez v. Barnhart**, 292 F.3d 576, 580 (8th Cir. 2002); **Pearsall v. Massanari**, 274 F.3d 1211, 1217 (8th Cir. 2002); **Cox v. Apfel**, 160 F.3d 1203, 1206 (8th Cir. 1998).  First, the claimant cannot be presently engaged in "substantial gainful activity."  See 20 C.F.R. §§ 416.920(b), 404.1520(b).  Second, the claimant must have a severe impairment.  See 20 C.F.R. §§ 416.920(c), 404.1520(c).  The Social Security Act defines "severe impairment" as "any impairment or combination of impairments which significantly limits [claimant's] physical or mental ability to do basic work activities . . ."  Id. (alteration added).  "The sequential evaluation process may be terminated at step two only when the claimant's impairment or

combination of impairments would have no more than a minimal impact on [his] ability to work." **Caviness v. Massanari**, 250 F.3d 603, 605 (8th Cir. 2001) (alteration added).

At the third step in the sequential evaluation process, the ALJ must determine whether the claimant has a severe impairment which meets or equals one of the impairments listed in the regulations and whether such impairment meets the twelve-month durational requirement. See 20 C.F.R. §§ 416.920(d), 404.1520(d), and Part 404, Subpart P, Appendix 1. If the claimant meets this requirement, he is presumed to be disabled and is entitled to benefits. **Warren v. Shalala**, 29 F.3d 1287, 1290 (8th Cir. 1994).

At the fourth step, the ALJ will "review [claimant's] residual functional capacity ["RFC"] and the physical and mental demands of the work [claimant has] done in the past." 20 C.F.R. §§ 404.1520(e) and 416.920(e). "[RFC] is what the claimant is able to do despite limitations caused by all the claimant's impairments[,]" **Lowe v. Apfel**, 226 F.3d 969, 972 (8th Cir. 2000) (citing 20 C.F.R. § 404.1545(a)) (alteration added), and requires "a function-by-function assessment based upon all of the relevant evidence of an individual's ability to do work-related activities,'" **Depover v. Barnhart**, 349 F.3d 563, 565 (8th Cir. 2003) (quoting S.S.R. 96-8p). "[RFC] 'is not the ability merely to lift weights occasionally in a doctor's office; it is the ability to perform the requisite physical acts day in and day out, in the sometimes competitive and stressful conditions in which real people work in the real world.'" **Ingram v. Chater**, 107 F.3d 598, 604 (8th Cir. 1997) (quoting McCoy v. Schweiker, 683 F.2d 1138, 1147 (8th Cir. 1982) (en banc)) (alteration added). The burden at step four remains with the claimant. See **Banks v. Massanari**, 258 F.3d 820, 824 (8th Cir.

2001); **Singh**, 222 F.3d at 451. "It is the claimant's burden, and not the Social Security Commissioner's burden, to prove the claimant's RFC." **Pearsall**, 274 F.3d at 1217.

If the ALJ holds at step four of the process that a claimant cannot return to past relevant work the burden shifts at step five to the Commissioner to establish that the claimant maintains the RFC to perform a significant number of jobs within the national economy. **Banks**, 258 F.3d at 824. See also 20 C.F.R. §§ 416.920(f), 404.1520(f). The Commissioner may meet her burden by referring to the medical-vocational guidelines (the "Grid") or by eliciting testimony by a vocational expert. **Pearsall**, 274 F.3d at 1219. The Grid may not be relied on if the claimant suffers from non-exertional impairments unless those impairments "do not diminish or significantly limit the claimant's [RFC] to perform the full range of Guideline-listed activities[.]" **Ellis v. Barnhart**, 392 F.3d 988, 996 (8th Cir. 2005) (alterations added; interim quotations omitted).

The ALJ's decision whether a person is disabled under the standards set forth above is conclusive upon this Court if it is supported by "substantial evidence on the record as a whole." **Dunahoo v. Apfel**, 241 F.3d 1033, 1037 (8th Cir. 2001); **Clark v. Apfel**, 141 F.3d 1253, 1255 (8th Cir. 1998). "Substantial evidence is less than a preponderance, but enough that a reasonable mind might accept it as adequate to support a decision." **Cox**, 160 F.3d at 1206-07. When reviewing the record to determine whether the Commissioner's decision is supported by substantial evidence, however, the court must also take into account whatever in the record fairly detracts from that decision. **Warburton v. Apfel**, 188 F.3d 1047, 1050 (8th Cir. 1999); **Baker v. Apfel**, 159 F.3d 1140, 1144 (8th Cir. 1998). The court may not

reverse that decision merely because substantial evidence would also support an opposite conclusion.  **Dunahoo**, 241 F.3d at 1037; **Tate v. Apfel**, 167 F.3d 1191, 1196 (8th Cir. 1999); **Pyland v. Apfel**, 149 F.3d 873, 876 (8th Cir. 1998).  Thus, if "it is possible to draw two inconsistent positions from the evidence and one of those positions represents the agency's findings, the [Court] must affirm the agency's decision."  **Wheeler v. Apfel**, 244 F.3d 891, 894-95 (8th Cir. 2000) (alteration added).

### Discussion

Plaintiff argues that the ALJ's adverse decision is not supported by substantial evidence on the record as a whole.  Specifically, the ALJ erred by (1) adopting the opinions of the nonexamining sources over the opinion of Dr. Reid, and (2) applying the Grid.  The Commissioner disagrees.

Sources' Opinions.  "[T]o meet Listing 12.05C, a claimant must show:  (1) a valid verbal, performance, or full scale IQ of 60 through 70; (2) an onset of the impairment before age 22; and (3) a physical or other mental impairment imposing an additional and significant work-related limitation of function."  **Maresh v. Barnhart**, 431 F.3d 1073, 1075 (8th Cir. 2005) (alteration added).  The first two requirements are clearly satisfied.  "The third requirement of Listing 12.05C is that the claimant has a physical or other mental impairment imposing an additional and significant work-related limitation of function, i.e., a 'more than slight or minimal' effect on the ability to perform work."  **Id.** (quoting Buckner v. Apfel, 213 F.3d 1006, 1011 (8th Cir. 2000)).  Some impairments, e.g., difficulty concentrating, are

"merely symptoms or manifestations" of mental retardation and others, e.g., an inability to

get along well with others, are separate impairments.  <u>See</u> **Buckner**, 213 F.3d at 1012.

A claimant satisfies the criteria of Listing 12.05(D) if he or she has, in addition to an

IQ in the range set forth in Listing 12.05(C), threshold limitations in at least two functional

areas, i.e., marked restrictions of activities of daily living; marked difficulties in maintaining

social functioning; marked difficulties in maintaining concentration, persistence, or pace; and

repeated episodes of decompensation.  20 C.F.R. Pt. 404, Subpt. P, App.1 § 12.05(D).

Again, it is undisputed that Plaintiff has a qualifying valid IQ.  The question is the effect of

that IQ on his ability to function.

Plaintiff argues that Dr. Reid's conclusions about this effect, i.e., his ability to

maintain the attention required to perform simple, repetitive tasks and to withstand the stress

and pressure associated with day-to-day work activity was moderately impaired and his

ability to understand, remember, and follow instructions was slightly impaired, satisfies the

additional criterion of either Listing 12.05(C) or 12.05(D).  As noted by the Commissioner,

Dr. Reid examined Plaintiff in September 2001.  This examination was only one month after

Plaintiff began working at the airport, and Dr. Reid's report does not indicate that he

reviewed Plaintiff's work record or school records.  After Plaintiff had worked at the airport

for six months, he was evaluated as following instructions well, getting along well with his

supervisors, being able to do some tasks independently, and doing work of average quality

and quantity.  Later evaluations by supervisors rated Plaintiff as being able to accomplish

tasks independently and to follow instructions.  Moreover, his special education teacher had

the longest on-going relationship with Plaintiff and concluded that he did not have a substantial loss in his ability to, inter alia, respond appropriately at work and to deal with changes in a routine work setting.

Plaintiff correctly notes that "*[g]enerally*, . . . more weight [is given] to the opinion of a source who has examined [the claimant] than to the opinion of a source who has not examined [the claimant]." 20 C.F.R. § 416.927(d)(1) (alterations added) (emphasis added). <u>See</u> <u>also</u> Social Security Ruling 96-6p (cautioning that "[i]n appropriate circumstances, opinions from State agency medical and psychological consultants and other program physicians and psychologists may be entitled to greater weight than the opinions of treating or examining sources"). In the instant case, however, the ALJ based his assessment of Plaintiff's functional limitations on the records of his actual performance in work situations, and found the opinion of the nonexamining sources consistent with that assessment. The results of a one-time evaluation conducted shortly after Plaintiff began working does not trump the other, consistent evidence in the record.

The ALJ must determine a claimant's RFC by "a function-by-function assessment based upon all of the relevant evidence of an individual's ability to do work-related activities.'" **Depover**, 349 F.3d at 565 (quoting S.S.R. 96-8p). The relevant evidence before the ALJ included the opinions of Plaintiff's supervisors and of his special education teacher about his ability to function in a work setting. These opinions were given by people who were in a position to observe Plaintiff working over a period of time and closer in time to the ALJ's decision. Dr. Reid, on the other hand, conducted a one-time evaluation of Plaintiff

almost three years before the ALJ rendered his decision. He did not have the longitudinal observation of Plaintiff the other sources did. Moreover, the evidence in the record establishes that Plaintiff gained socialization skills and increased his ability to stay focused and on task in the months between Dr. Reid's report and the reports of the supervisors and special education teacher. The assessment by Drs. Cottone and Moreno were not based on any examination of Plaintiff, but they were consistent with the other evidence in the record, unlike Dr. Reid's assessment. The ALJ did not err by not giving controlling weight to Dr. Reid's opinion.[7]

Application of the Grids. Plaintiff further argues that the ALJ erred by applying the "Grids."

"The ALJ may not rely on the grids if [a claimant] suffers from non-exertional impairments, but instead must obtain the opinion of a vocational expert." **Ellis**, 392 F.3d at 996 (alteration added). "Non-exertional impairments that do[ ] not diminish or significantly limit the claimant's residual functional capacity to perform the full range of Guideline-listed activities do not prevent use of the grids, however." **Id.** (alteration in original) (interim quotations omitted). See also **McGeorge v. Barnhart**, 321 F.3d 766, 768-69 (8th Cir. 2003) ("[T]he law of this circuit states that an ALJ may use the Guidelines even though there is a

---

[7]Additionally, some instances of Plaintiff's inability to function cited by him are not without question in the record. For example, Plaintiff argues he cannot drive or use public transportation without assistance; however, his testimony in the hearing was that he did not have a driver's license, not that he could not drive, and his testimony and the documentary record indicate that he did use public transportation without assistance. He also testified that he did not use the stove when his aunt was not at home because he did not want to be blamed if something went wrong, not that he could not use it.

nonexertional impairment if the ALJ finds, and the record supports the finding, that the nonexertional impairment does not diminish the claimant's residual functional capacity to perform the full range of activities listed in the Guidelines." (alteration added) (interim quotations omitted)).

In the instant case, the ALJ did not rely on the Grid. The opinion of the VE was an independent basis for the ALJ's conclusion that there was a sufficient number of jobs that Plaintiff could perform in the local economy. That opinion was given in response to a hypothetical question that properly included the ALJ's findings as to Plaintiff's RFC. See **Sultan v. Barnhart**, 368 F.3d 857, 864 (8th Cir. 2004) (finding that such a hypothetical question and the VE's response thereto constitutes substantial evidence).

## Conclusion

Considering all the evidence in the record, including that which detracts from the ALJ's conclusions, the Court finds that there is substantial evidence to support the ALJ's decision. Accordingly,

**IT IS HEREBY ORDERED** that the decision of the Commissioner is AFFIRMED and this case is DISMISSED.

An appropriate Judgment shall accompany this Memorandum and Order.

/s/ Thomas C. Mummert, III
THOMAS C. MUMMERT, III
UNITED STATES MAGISTRATE JUDGE

- 26 -

Dated this 23rd day of February, 2006.